HARRIS, Judge.
Appellant was indicted for murder in the first degree. He was represented at arraignment and trial by two experienced trial lawyers retained by him and his family. He pleaded not guilty. The jury found appellant guilty of manslaughter in the first degree and fixed his punishment at ten years in the penitentiary. Notice of appeal was made in open court and a free transcript was requested. Appellant was found to be indigent and a free transcript was furnished him. Trial counsel did not file a brief on this appeal and this Court appointed counsel to represent appellant on appeal.
There was considerable conflict in the evidence which was within the province of the jury to resolve.
On the night of August 22, 1975, there was a shoot-out at or near the Edgewood Lounge, also known as the Harlem Inn, located on High Street in Montgomery, Alabama. As a result of the shoot-out one woman was killed. Her son was wounded, and another woman was also shot.
Ernestine Givens testified that the deceased, Katherine Givens, was her mother-in-law and that she had known appellant most of her life. She was 26 years of age and appellant was 27 years of age. Ernestine Givens testified that on the night of August 22,1975, she was at the Harlem Inn and saw the deceased and appellant there. The Harlem Inn is a nightclub where alcoholic beverages are sold and consumed. It has a dance floor and music is furnished by a Rockola.
*68 Ernestine Givens testified that the deceased was sitting at a table with a Mary Ruth Givens. Appellant was with his brother, Ben Patterson, his aunt, Betty Patterson and another man. This latter group sat at a table next to the deceased. A fuss ensued between the deceased and Betty Patterson. The argument grew heated and the deceased drew a pistol on Betty Patterson and told her if she did not go away, she was going to hurt her, but she did not see the deceased point the pistol at Betty Patterson. She further stated that she did not see the deceased point her pistol at appellant or try to fire it at appellant in the Harlem Inn. The owner of the Harlem Inn told everyone to leave. As appellant was leaving he made the statement that everyone had better clear High Street when he returned.
Ernestine Givens further testified that she saw the deceased on the sidewalk next to the door of the Harlem Inn and that she had her pistol down by her side. Appellant returned with a .38 caliber and told the deceased to drop the gun she was holding down and the appellant told deceased that she was going to- die and the shooting started, but Ernestine stated she did not see the deceased try to shoot appellant when he was firing his pistol in her direction.
According to the State’s evidence appellant went home and told his mother, father and brothers that they were being ambushed at the Harlem Inn. Appellant’s brother, Charles Ray Humphrey, got a .22 rifle and went to the Harlem Inn. That appellant and Charles Ray stood side by side with appellant firing his .38 caliber pistol and Charles Ray firing the .22 rifle. The investigating officers found a number of spent .38 caliber cartidges and a number of spent .22 caliber cartridges at different places in the vicinity of the place where the shooting occurred. They also found an automatic pistol in the purse of the deceased.
A postmortem examination was preformed on the body of the deceased and two .22 caliber slugs were removed. Dr. Richard Roper of the State Department of Toxicology performed the autopsy. He testified that one bullet entered the back of the neck of the deceased and another entered her side. He stated that the cause of death “resulted from hemorrhage and shock and central nervous system trauma.” He further testified that the deceased had a blood alcohol level of .14 percent and this would indicate that the deceased was under the influence of intoxicating beverages. Dr. Roper delivered the two slugs he removed from the body of the deceased to Mr. Charles Smith, a criminalist in his department.
Mr. Smith whose qualifications were not questioned by the defense testified that he test-fired the .22 rifle and made a comparison with the two slugs delivered to him by Dr. Roper and they “were consistent in' all major class characteristics,” but he could not say they were fired from that particular rifle but there was noting to indicate that they were not fired from this rifle.
The officers turned over to Mr. Smith a .38 caliber pistol together with some spent cartridges and some live rounds of .38 caliber bullets. Mr. Smith test-fired the pistol and made a comparison and reached the same conclusion he reached with reference to the .22 rifle. He examined the pistol that was found in the purse of the deceased and found that the bullet in the chamber had “misfired” indicating that someone had tried to fire this weapon.
Appellant’s father testified that his son came home around 1:00 a.m. on the morning of August 22, 1975, and told him that they were being “ambushed” at the club on High Street. He stated that appellant left but he did not see him carry a pistol. He further testified that he did not see his other son, Charles Ray, leave the house, but that appellant and Charles Ray came back to the house in about 20 minutes and appellant had his pistol and Charles Ray had the rifle. Appellant told his father that they “both shot” but he thought he shot a woman in the leg. The father told appellant to call the Police Department and he did. When the officers came to appellant’s father’s house looking for the weapons used in the shoot-out, the father gave them to *69 the officers on the porch of his home. The officers did not enter the house and conduct a search.
Harold Washington testified that he was at the Harlem Inn the night of the shooting and that he knew appellant. He stated that he was standing in front of the Harlem Inn when he heard someone come around the corner and say, “All you _ _ clear the corner.” Washington ran to the other side of the street and heard some shots. When the shots were over, he went back across the street and saw “two ladies laying on the sidewalk, and a young dude.” He said he saw the deceased on the sidewalk before she was shot and did not see her point a gun at anyone.
Appellant and Charles Ray were arrested and carried to the station house where Detective C. H. Brannon read appellant the Miranda rights and warnings and appellant signed a waiver of rights form. He then gave Detective Brannon a signed statement. A voir dire examination was conducted out of the presence and hearing of the jury to determine the voluntary character of the statement. The Court ruled the statement was voluntarily made and the proper predicate was laid and the statement was introduced into evidence. The statement is as follows:
“Montgomery Police Department Room 210-2
August 22, 1975, 3:00 A.M.
“I, Edward Junior Humphrey, Black Male, DOB 2-10-48, home address 445 South Hall Street, Home telephone 264-9781, give the following statement to Detective C. H. Brannon, Jr., of the Montgomery Police Department regarding a shooting incident which occurred earlier tonight on High Street. I have been advised of my rights and I understand them and know what I am doing. No promise or threats have been made to me by anyone and no pressure of any kind has been made against me by anyone.
“Q. Tell me what happened tonight?
“A. My brother Ben and myself Ed, Betty, Louis, and I think they call him Red was at one table at the Harlem Inn. Betty left from the table that we was at. It was three girls sitting in the back of us. One of them was named Ernestine, Mamie Dean, and one was named Harriet. I don’t know the exact words that was in the conversation that they was saying. It was the table that was sitting directly in front of the table that I was at that the Givens lady — the lady that got shot — was sitting. She said to Betty— but she was talking about Ernestine, and she said that’s my daughter-in-law and this is my friend and she pointed at ‘Baby-Doll.’ They call her Baby-Doll but her name is Harriet. I don’t know what all else was said but it was going back and forth between her and Betty. About three or four words were exchanged. This Givens lady put her pocket book on top of the table, she reached in her pocket book, and she got out a pistol — it was a silver pistol. She stepped around from where she was sitting at in front of me. Betty was behind me. I got up from where I was sitting and walked up towards the bar. The man that owned the place he grabbed her wrist what had the gun. My oldest brother Ben he asked her what was going on. She allowed I’m gone kill me two mother fuckers and the man what owned the place said get your brother out of her to me. The Givens lady scratched me on my stomach. I don’t think she was meaning to do it. I got to the door. I don’t know who it was. It was the little girl that was with her. She had a object in her hand and she hit me directly in the hand with it. To me it was a Chámpale bottle. My brother and Betty was still in the place when I left. I ran home. I told my mother — I say Mama open the door. I said they got Betty and Ben up there and they trying to kill them. My brother Ray was asleep. My brother Josie was asleep. Joseph and Ray woke up. Ray had a rifle and I had a thirty-eight. To my knowledge there wasn’t but two shots that was fired and it was from the automatic rifle. She was on the outside when we got back. She *70 had her back turned towards me. She turned around in the company of a young man — now I know it was her son, but I didn’t know it then. She raised the gun about level to her breast and she was turning towards me. I hollered out real loud, I said drop it Mam — them’s the words I used. About that time a gun went off. It could of been two shots. Both people fell — the person that was with her and she did. I told everybody that was up there with her to go home. That’s all. I called ya’ll when everything quieted down.
“Q. When you left the Harlem Inn and went home to get help was the manager still struggling with Givens lady over the gun?
“A. Yes.
“Q. Why didn’t you try to call the police?
“A. My mother called the police.
“Q. Did you come home, to get your gun?
“A. No. I went by my brother-in-law’s house on the way back up to the place and got the thirty-eight.
“Q. Who is your brother-in-law and where does he live?
“A. His first name is Cleve. I don’t know his last name. He lives on Youg-ene Curve and he works at Oak Park.
“Q. How long was it from the time you left the Harlem Inn until the time you returned to the Harlem Inn?
“A. I would estimate ten minutes, maybe fifteen.
“Q. Who went back to the Harlem Inn with you?
“A. Ray and Joseph. They had beat me back up there. I was the last getting back up there.
“Q. What kind of weapon did Joseph have?
“A. He didn’t have anything.
“Q. Why didn’t Ben and your aunt leave when you did?
“A. I can’t say why Ben didn’t leave. Betty was behind me and walked out when I did. When I got back up there Ben and Betty was on the outside.
“Q. Did you shoot your pistol?
“A. Yes sir.
“Q. How many times and who did you shoot?
“A. One time. I didn’t shoot anybody. I shot above her head.
“Q. Above who’s head?
“A. The lady who had the gun.
“Q. How many time did Ray shoot and who did he shoot?
“A. It was an automatic rifle. I don’t know how many times he shot. The lady and the person that was with her fell.
“Q. Is Betty your aunt?
“A. Yes. My mother’s sister.
“Q. What is her full name and where does she live?
“A. Betty Deloris Lewis. 738 Alabama Street.
“Q. Did you go home and get a gun and go back up to the Harlem Inn without calling for the police or waiting for the police?
“A. I didn’t call them — My mother did. I didn’t wait for them.
“Q. When you got back up to the Harlem Inn was the lady aiming the gun at Ray or who?
“A. Ray got back up to the scene before I did but he wasn’t standing as close to the lady as I was. She had her back to me and she turned around and pointed the gun at me.
“Q. What was the lady doing when you first saw her?
“A. When I came back she was in between two brick pillars. There are some steps going up to a house just the other side of the Harlem Inn and there is a sort of a walkway and the sides of the walkway and her and this fellow was sort of squatting against the blind side of these pillars. Because you can’t see them from down towards Bibbens way.
“Q. How did you know they were squatting where they were?
“A. When I got there she stepped out from behind the walkway. The fellow that was with her — I don’t know what he said I wasn’t that close to her. She *71 turned her back to me. She turned back around and she made about two steps. When she turned around she brought her gun about chest high. I fired above her head and at that length of time I heard one or two more gunfire. And her and the person that was with her fell and we left.
“Q. Have you anything you would like to add to this statement?
“A. No sir.
“I have read the above and it is true and correct to the best of my knowledge and memory. I have been read my rights and understand them and know what I am doing. I do willingly and voluntarily sign my name.
Wit: /s/ C. H. Brannon. Jr. Det. C. H. Brannon, Jr.
/s/ Edward Junior Humphrey
Edward Junior Humphrey”
Appellant claims that the trial court committed reversible error in charging the jury on the law of conspiracy. We do not agree. Title 14, Section 14, Code of Alabama 1940.
The leading case on this issue is Stokley v. State, 254 Ala. 534, 49 So.2d 284, where the Supreme Court said:
“It is well established that when, by prearrangement or on the spur of the moment, two or more persons enter upon a common enterprise or adventure and a criminal offense is contemplated, then each is a conspirator, and if the purpose is carried out, each is guilty of the offense committed, whether he did any overt act or not. This rests on the principle that one who is present, encouraging, aiding, abetting, or assisting, or who is ready to aid, abet, or assist the other in the perpetration or commission of the offense, is a guilty participant, and in the eye of the law is equally guilty with the one who does the act. Such community of purpose or conspiracy need not be proved by positive testimony. It rarely is so proved. The jury is to determine whether it exists, and the extent of it, from the conduct of the parties and all the testimony in the case. Morris v. State, 146 Ala. 66, 41 So. 274, and cases cited; Jones v. State, 174 Ala. 53, 57 So. 31; Teague v. State, 245 Ala. 339, 16 So.2d 877.
“When two or more persons enter upon an unlawful purpose, with a common intent to aid and encourage each other in anything within their common design, they are each responsible, civilly and criminally, for everything which may consequently and subsequently result from such unlawful purpose, whether specifically contemplated or not. Jones v. State, supra; Jolly v. State, supra; Tanner v. State, 92 Ala. 1, 9 So. 613.”
Next appellant contends that the conduct of the trial court which tends to indicate to the jury the Court’s contempt for defense counsel constitutes reversible error. The cases relied on by appellant fully support this contention. We have carefully read the record in the light of the serious charge made in brief but the facts simply do not support the charge made by counsel. Of course a trial judge has the duty to be courteous, patient, just and impartial, and this duty extends to the demeanor of the judge. Allen v. State, 290 Ala. 339, 276 So.2d 583.
Our examination of the record reveals that the trial judge did manifest a degree of impatience with reference to the failure of counsel to call to his attention motions to suppress certain evidence until the trial was well underway. This all took place in chambers and not in the presence of the jury.
This was a cold blooded murder and the fact that appellant was convicted of manslaughter in the first degree has to be due to the resourcefulness of his trial counsel.
We find no reversible error in the record and the case is due to be affirmed.
AFFIRMED.
All the Judges concur.